UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE,

          Plaintiff,

    v.

MOISES BECERRA,

          Defendant.

Case No. 23-cv-04767-PCP

**ORDER ON HABEAS PETITION**

      Petitioner John Doe has been detained at a private immigration detention facility for more than 30 months while his removal proceedings and several related legal challenges are progressing. He has petitioned this Court for a writ of habeas corpus, arguing that this prolonged civil detention violates due process. Given the conditions at the facility where Mr. Doe is detained and the available alternatives, the Court concludes that Mr. Doe's prolonged detention has become excessive in relation to the government's purposes and has therefore become punitive in violation of Mr. Doe's rights under the Due Process Clause of the Fifth Amendment.

## I. Background

      Mr. Doe was born in Mexico. He has lived in the United States since he was an infant. He is not a U.S. citizen, although his daughter, partner, brother, sister, mother, and stepfather all are.

      In 1997, Mr. Doe pleaded guilty to assault with great bodily injury.[1] He was sentenced to five years of probation. In 2001, he was convicted by a jury of second degree robbery and attempted second degree robbery. He was accused of throwing a bicycle at a car, trying to punch a

---

[1] Mr. Doe asserts that he did not sign this purported plea agreement and was not made aware of the legal consequences (including the immigration consequences) of a guilty plea. He is petitioning in state court for post-conviction relief on this basis, among others.

window of the car, and trying to get into the car. He was sentenced to twenty-six years and four months in prison, with enhancements based on his earlier conviction and his gang involvement. Mr. Doe was in his twenties at the time of each of these convictions.

Mr. Doe then spent about two decades in California state prison. During that time, he earned his general education diploma. In 2018, based on Mr. Doe's good record in prison, the warden recommended that he volunteer to join the state Fire Camp program, and Mr. Doe did so. Only prisoners with "minimum custody" status are eligible to volunteer for the Fire Camp. This is the lowest security classification and is based on "sustained good behavior in prison, ability to follow rules, and participation in rehabilitative programming." *See* Conservation (Fire) Camp Program, Cal. Dep't of Corr. & Rehab., Dkt. No. 49-2, at 31, perma.cc/4S2S-GVNR. Mr. Doe completed the coursework to become a frontline chainsaw sawyer and went on to become the lead chainsaw operator on his crew. He helped fight wildfires throughout California, including the Dixie fire, the El Dorado fire, and several others. His supervisor stated that he "displayed a very strong work ethic and positive attitude while performing arduous work on fire assignments," "always completed all tasks as requested," and "did not have any conflicts" with supervisors.

Mr. Doe was released from state prison in September 2021. He is on state parole until September 2024. Mr. Doe will be 50 years old when his parole concludes.

Upon his release from state prison on September 30, 2021, Mr. Doe was immediately detained by U.S. Immigration and Customs Enforcement (ICE). ICE initiated proceedings to remove Mr. Doe to Mexico and detained him pending those proceedings pursuant to 8 U.S.C. § 1226(c), which requires detention pending removal of noncitizens convicted of certain categories of crimes. The parties do not dispute that Mr. Doe is covered based on his past convictions. Mr. Doe has been detained at the Golden State Annex (GSA), a private immigration detention facility operated for profit by The GEO Group, Inc., since September 2021.

\*       \*       \*

Mr. Doe has four pending legal proceedings. First, he is directly contesting his removal. After two initial custody redetermination hearings, the agency concluded that detention was warranted. At Mr. Doe's first removal hearing in October 2021, he asked for a continuance to

consult an attorney. Mr. Doe's partner retained an attorney to represent him in the removal proceedings. At his next hearing several weeks later, Mr. Doe, through counsel, conceded the charge of removability but asked for a continuance in order to file an application for relief under the Convention Against Torture. Mr. Doe claims that he fears for his life and will face torture if deported to Mexico because he renounced his prior gang affiliation. After several continuances, an immigration judge held three merits hearings on Mr. Doe's relief application throughout the summer of 2022. Three months after the last of those hearings, in November 2022, the immigration judge denied Mr. Doe's application and ordered him removed to Mexico. Less than a month later, in December 2022, Mr. Doe appealed that decision to the Board of Immigration Appeals (BIA). The BIA dismissed the appeal six months later, in May 2023. Mr. Doe then filed a petition for review of that dismissal in the Ninth Circuit.

Second, Mr. Doe is seeking to reopen his original removal proceedings based on a claim of ineffective assistance of counsel and additional evidence showing a particularized risk of torture if he returns to Mexico. Mr. Doe asserts that his first attorney failed to discover and inform him that he was eligible to apply for adjustment of status to lawful permanent resident based on a petition his mother had filed in 1992, that the attorney failed to competently present his Convention Against Torture application by submitting scant evidence, and that the attorney unnecessarily prolonged his detention by failing to notify Mr. Doe that she had been suspended by the California State Bar and instead requesting continuances. Mr. Doe's additional evidence of torture risk includes expert opinions that Mr. Doe is more likely than not to be kidnapped or killed by Mexican gangs or cartels with ties to U.S. gangs because he renounced his gang affiliation by defying the gang's orders in prison.

Mr. Doe filed a motion with the BIA to reopen his removal proceedings on these bases in May 2023. Four months later, in September 2023, the BIA denied the motion, concluding that Mr. Doe had not been prejudiced. Mr. Doe appealed this denial to the Ninth Circuit. In December 2023, at the government's request, the Ninth Circuit remanded the motion to reopen to the BIA to address the legal standard for prejudice that applies to ineffective assistance of counsel claims. Mr.

Doe's removal and his Ninth Circuit petition seeking review of the BIA's removal decision are both stayed while the BIA addresses that issue on remand.

Third, Mr. Doe is challenging his two original criminal convictions in state court. He first filed a pro se habeas petition seeking review of his 2001 conviction. The court then appointed an attorney to represent him. With that attorney, Mr. Doe has also filed a challenge to his 1997 guilty plea and conviction. A state court hearing on both petitions is set for May 8, 2024.

Fourth, in September 2023, Mr. Doe petitioned this Court for a writ of habeas corpus. He argued that his nearly two years of detention throughout these various proceedings violated both procedural and substantive due process. The Court concluded that procedural due process at a minimum required the government to provide Mr. Doe with a bond hearing before an immigration judge. Dkt. No. 29, ––– F.3d ––––, 2023 WL 8307557 (2023). The Court held Mr. Doe's substantive due process challenge in abeyance pending that bond hearing. An immigration judge held a bond hearing on December 12, 2023 and denied bond in an oral decision. Mr. Doe appealed that denial to the BIA on January 8, 2024. Shortly thereafter, on January 17, 2024, the immigration judge issued a written memorandum explaining his reasons for denying bond in order to facilitate BIA review. This BIA appeal remains pending.

After the immigration judge initially denied bond, this Court held a hearing on Mr. Doe's substantive due process claim and ordered additional briefing and submission of evidence regarding that claim. Dkt. No. 44, ––– F.3d ––––, 2024 WL 1130835 (2024).

\*      \*      \*

Mr. Doe has been detained at GSA, the private immigration detention facility, throughout these proceedings. According to Mr. Doe, the facility is overcrowded and dirty, with hygiene supplies running low. Mr. Doe is housed in a dormitory-style accommodation with minimal privacy and limited access to medical and legal services. According to a declaration from an attorney who has conducted regular in-person legal clinics at the facility, the detainee population at GSA ballooned from 130 in January 2023 to 400 in recent weeks. The attorney reports that detainees have faced significant delays in accessing everything from medical care and basic hygiene supplies to meals and water. The attorney also reports that access to the software used to

4

1    enable virtual meetings between detainees and attorneys has been limited, which has been

2    exacerbated by shortages of tablets and phones. Calls are capped at ten minutes.

3    **II.    Legal Standards**

4           The Fifth Amendment's Due Process Clause provides that "[n]o person shall be ...

5    deprived of life, liberty, or property, without due process of law." It specifically "entitles aliens to

6    due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993).

7           The Court can grant a writ of habeas corpus to people detained "under ... the authority of

8    the United States" or "in violation of the Constitution or laws or treaties of the United States." 28

9    U.S.C. § 2241(c)(1), (c)(3). A writ application "shall allege the facts concerning ... detention." *Id.*

10   § 2242. Allegations made in an answer to a habeas petition, "if not traversed, shall be accepted as

11   true." *Id.* § 2248. Oral testimony, depositions, affidavits, and documentary evidence are

12   permissible. *See id.* §§ 2246–47. After receiving an application, the Court must "summarily hear

13   and determine the facts, and dispose of the matter as law and justice require." *Id.* § 2243.

14          Section 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226, governs the

15   apprehension and detention of noncitizens whose removal proceedings are pending. Subsection (c)

16   subjects certain noncitizens to mandatory detention because of specified criminal offenses.

17          The statute limits judicial review of certain decisions made during the removal process.

18   For arrest and detention under Section 1226, subsection (e) provides that a "discretionary

19   judgment regarding the application of this section shall not be subject to review." This "applies

20   only to 'discretionary' decisions about the 'application' of § 1226 to particular cases." *Nielsen v.*

21   *Preap*, 139 S. Ct. 954, 962 (2019). "Although § 1226(e) restricts jurisdiction in the federal courts

22   …, it does not limit habeas jurisdiction over constitutional claims or questions of law." *Singh v.*

23   *Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003)

24   ("Section 1226(e) contains no explicit provision barring habeas review, and … does not bar

25   respondent's constitutional challenge to the legislation authorizing his detention without bail.").

26   **III.    Analysis**

27          The Supreme Court held more than a century ago that civil detention of a removeable

28   noncitizen violates the Constitution if it is punitive. *Wong Wing v. United States*, 163 U.S. 228,

237–38 (1896). That is so because the individual has not been accorded any of the procedural protections the Constitution demands before the imposition of punishment. *Id.* Binding Supreme Court and Ninth Circuit precedent establish that detention can become punitive is if it is excessive in relation to the government's regulatory purposes, and that both the duration of detention and the conditions of the individual's confinement inform this analysis.

### A. Due Process Protects Immigration Detainees from Punitive Detention.

The Supreme Court has held that the Due Process Clause applies to every "person" in the United States. It "protects every one of these persons from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). In particular, "the Due Process Clause protects an alien subject to a final order of deportation." *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) (citing *Wong Wing*, 163 U.S. at 238).

Mr. Doe is detained pursuant to 8 U.S.C. § 1226(c). Detention under this statute is mandatory. While subsection (a) grants the Attorney General discretion to release noncitizens on bond or conditional parole pending a final removal decision, subsection (c) provides no such discretion. Instead, the Attorney General "shall take into custody" inadmissible or deportable noncitizens who have committed certain criminal offenses, and the statute authorizes release only in narrow circumstances not applicable here. 8 U.S.C. § 1226(c).

Section 1226(c)'s mandatory detention during removal proceedings does not initially violate due process. This detention is "a constitutionally valid aspect of the [removal] process." *Demore*, 538 U.S. at 523. But in *Demore*, which involved only a facial challenge to Section 1226(c), the Supreme Court emphasized that detention was permissible for the "brief" and "limited period" needed for removal proceedings. *Id.* at 513, 526. The *Demore* Court specifically noted that in the "majority of cases," Section 1226(c) detention "lasts for less than … 90 days" (a duration that had previously been "considered presumptively valid") and that even in the 15% of cases involving appeals, that additional process "takes an average of four months." *Id.* at 529.

Due process protections do not disappear simply because mandatory detention under Section 1226(c) is at least initially permissible. The government may have "significantly more latitude in detaining noncitizens," as it argues, but even broad latitude cannot be constitutionally

unconstrained. At a "bare minimum," noncitizens subject to civil immigration detention—just like people detained under civil process or accused but not convicted of a crime—"cannot be subjected to conditions that 'amount to punishment.'" *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *see also Wong Wing*, 163 U.S. at 235 (concluding that "detention or temporary confinement" is "valid" to carry out "the provisions for the exclusion or expulsion of aliens," but that detention involving "imprisonment at hard labor" is unconstitutional without a full criminal trial).

Accordingly, even though mandatory civil detention under Section 1226(c) is permissible at the outset of removal proceedings, that detention violates due process if it becomes punitive and the detainee has not been accorded the full constitutional protections required before such punishment may be imposed.

According to binding Ninth Circuit precedent, "at some point [civil] detention can become excessively prolonged, and therefore punitive, resulting in a due process violation." *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021). This can be true even if the detention will necessarily end. *Id.* at 709–10 (concluding that a pretrial detainee's 21-month detention was "approaching the limits of what due process can tolerate" and that "at some point, regardless of the risks associated with Torres's release, due process will require that he be released if not tried").

Another way civil detention becomes punitive is if the conditions of detention are too harsh. In *Jones*, for example, the Ninth Circuit considered the due process rights of people who had completed prison sentences but remained in detention pending involuntary civil commitment proceedings. The court emphasized that people detained under civil rather than criminal process are "entitled to more considerate treatment than … criminally detained counterparts." 393 F.3d at 932. Accordingly, when a detainee "is confined in conditions identical to, similar to, or more restrictive than, those in which … criminal counterparts are held," courts "presume that the detainee is being subjected to 'punishment.'" *Id.* People civilly detained pending a commitment adjudication also cannot be subjected to conditions that are *worse* than they would face if committed, conditions that themselves cannot be worse than the conditions of detention imposed as punishment for a criminal conviction. *Id.* at 932–33. In other words, "purgatory cannot be

worse than hell." *Id.* at 933. If conditions of civil confinement are equivalent to or more restrictive than criminal detention or civil post-commitment detention, they are presumptively punitive and the burden shifts to the government "to show (1) legitimate, non-punitive interests justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to these interests." *King v. Cnty. of L.A.*, 885 F.3d 548, 557 (9th Cir. 2018) (cleaned up) (citing *Jones*, 393 F.3d at 933).[2]

In short, due process imposes outer bounds on both the duration and conditions of civil immigration detention. The question then becomes how to determine whether those boundaries have been crossed.

The Court previously identified five factors that are relevant in determining whether continued detention under Section 1226(c) violates substantive due process:

> (1) the length of detention and whether it is excessive in relation to its regulatory purpose;
>
> (2) the government's contribution to any delay;
>
> (3) the evidence supporting the determination that detention is warranted to prevent flight risk or community danger;
>
> (4) whether the government interests in ensuring appearance at future proceedings and protecting the community could be protected through alternatives to detention that are less harsh; and
>
> (5) the conditions of detention and how they compare to conditions under which pretrial criminal detainees or people convicted of crimes are held.

2024 WL 1130835, at *3 (citations omitted).

These five factors come from Ninth Circuit cases regarding detention before criminal trial and civil commitment proceedings. As the Court previously summarized:

_____

[2] The Ninth Circuit has not directly applied the *Jones* presumptions to immigration detention, but it has assumed that they could be invoked in that context. *Fraihat v. ICE*, 16 F.4th 613, 648 (2021). The logic of *Jones*, however, applies with equal force in the immigration context. And even if worse conditions do not create a presumption of punishment, considering the conditions a detainee faces is certainly relevant to the due process analysis. *See Wong Wing*, 163 U.S. at 238 (concluding that removable aliens could be detained "according to law for deportation" but could not subjected to "imprisonment at hard labor at and in the Detroit House of Correction").

1

2

3

4

5

6

7

8

9

10

> In the context of detention before criminal trial, the Ninth Circuit weighs several factors in considering whether detention has crossed the line from regulatory to punitive. These include "(1) the length of the defendant's pretrial detention; (2) the prosecution's contribution to the delay; and (3) the evidence supporting detention under the Bail Reform Act." *Torres*, 995 F.3d at 708. In the context of detention before involuntary civil commitment proceedings, the Ninth Circuit has explained that even if not intended to punish, detention is punitive and violates substantive due process "where it is excessive in relation to its non-punitive purpose, or is employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones*, 393 F.3d at 934 (cleaned up). Moreover, "a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Id.*

11  2024 WL 1130835, at *3. Although the Court recognized that this case does not involve detention

12  before a criminal trial or civil commitment proceedings, the Court concluded that the relevant

13  statutes "are analogous" and that "the constitutional principles that limit them are similar." *Id.*

14       The government argues that these comparisons are inapt and that applying a test based on

15  these "mismatched" standards would be improper. But the government offers no alternative test

16  other than a heads-I-win-tails-you-lose approach that would simply conclude in all cases that

17  mandatory detention under Section 1226(c) is constitutionally valid, no matter how long it lasts.

18       The government's arguments against looking to the due process limits on civil detention in

19  other contexts are unconvincing. The government first argues that its "plenary authority is at its

20  zenith in the immigration context." This context must of course inform any due process analysis,

21  which must be undertaken on a "case-by-case" basis. *Torres*, 995 F.3d at 708. But the Supreme

22  Court has instructed that noncitizens subject to detention remain "entitled to … constitutional

23  protection" even though Congress, "in the exercise of its broad power over … immigration," can

24  "make[] rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 77, 79–80.

25       The government also emphasizes that Mr. Doe's detention is finite and that because he has

26  already gone through initial removal proceedings, he has a "significantly diminished liberty

27  interest as compared to a pre-trial detainee." But pretrial detainees also go through some initial

28

proceedings before being detained, and *Jones* and the Ninth Circuit's subsequent cases hold that the due process limits on criminal pretrial detention set a *floor* for other forms of civil detention.

The government next argues that the Bail Reform Act is not analogous to Section 1226(c), including because it provides for federal court review of pretrial detention and bail decisions, because it contemplates individual bail hearings even for people with serious charges, and because detainees awaiting trial do not have the option to leave detention by leaving the country. But the fact that there are differences between these statutes does not undermine the Court's previous conclusion that the constitutional framework the Supreme Court applied to uphold the Bail Reform Act against a facial challenge in *United States v. Salerno*, 481 U.S. 739 (1987), applies equally in considering other civil detention statutes. If anything, the fact that the Bail Reform Act includes additional protections simply suggests that the results of this analysis may be different.

Accordingly, the Court again concludes that the five factors it previously identified provide the appropriate lens for considering Mr. Doe's substantive due process claim.

**B.      Mr. Doe's Continued Detention Violates Due Process.**

The relevant factors establish that Mr. Doe's prolonged and continuing detention violates due process.

**1.      Duration of Detention**

The first factor is the duration of detention and whether it has become excessive in relation to its regulatory purpose. Mr. Doe has been detained since September 30, 2021. He is now well into his third year of civil detention with no fixed end in sight. As of this order Mr. Doe has been detained for 945 days—more than 30 months. His removal is stayed indefinitely while his various appeals and legal challenges to both his removal and the underlying convictions that require his detention and prevent him from obtaining U.S. citizenship proceed.

The Ninth Circuit has held in the criminal pretrial context that a defendant's "twenty-one-month detention does not yet violate due process." *Torres*, 995 F.3d at 709. But the *Torres* court cautioned that 21 months was "approaching the limits of what due process can tolerate," and that this length was "significant under any metric and … deeply troubling." *Id.* The fact that detention had lasted so long "weigh[ed] in favor of recognizing a due process violation." *Id.* at 708. But

based on the specific balance of all of the relevant factors, including that strong evidence supported detention and that the prosecution had not contributed to the delay (which was a result of continuances either requested by the defendant or necessitated by the Covid-19 pandemic), the Ninth Circuit found that the 21-month detention was constitutionally permissible in the defendant's particular case. *Id.* at 709.

"There is no bright-line limit on the length of detention that applies in all circumstances; but for every of set of circumstances, due process does impose some limit." *Torres*, 995 F.3d at 710 (quoting *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012)). Mr. Doe has been detained for nearly a year longer than the defendant in *Torres*. Last year, noncitizens with criminal convictions were detained for an average of 43.9 days. *See* ICE, FY 2023 Detention Statistics, perma.cc/73GL-5NYX. Mr. Doe's detention has already lasted over twenty times that average.

The government argues that 30 months of detention is neither excessive nor punitive. In fact, it argues that detention during removal proceedings "can never be excessive" as long as proceedings are still pending. The government of course has significant interests at stake, including ensuring Mr. Doe's appearance at future proceedings and preventing him from committing crimes. But *Torres* held that these interests, which are nearly identical to the interests that support pretrial criminal detention, are not so overpowering that they automatically trounce detainees' unquestionably strong interests in their own physical liberty in every case.

One reason the government argues that detention pending removal proceedings is always permissible as long as those proceedings are ongoing is that removal proceedings, by definition, have a certain endpoint. Once all of his various legal proceedings have each fully concluded, Mr. Doe will be released from detention. He will either be removed to Mexico or allowed to remain in the United States. The problem is that this endpoint, while certain to occur at some point, is not currently in sight. Mr. Doe is well into his third year in detention and neither Mr. Doe nor the government can yet say when his proceedings are guaranteed to be over, which depends at least in part on decisions and processes beyond either party's direct control.

Another reason the government argues that detention during removal proceedings is always permissible is that detainees in this situation—unlike, for example, pretrial criminal

defendants—always have the option of leaving detention by agreeing to removal. This is true in the abstract, and in cases where a detainee is pursuing a challenge to removability unrelated to the conditions in the country to which they would be removed, their ability to leave the United States pending their removal proceedings might weigh against finding prolonged detention excessive. But the analysis is different in cases like Mr. Doe's, where the essence of at least one of Mr. Doe's pending challenges is that he claims he will be tortured or killed if he leaves detention and is deported to Mexico. The merits of Mr. Doe's claims have not been finally adjudicated. But if Mr. Doe is correct, any "choice" between remaining in detention (with the hope of ultimately staying in the United States) and returning to Mexico may be illusory.

Thirty months is an extraordinary amount of time to spend in civil detention, including immigration detention. ICE's own statistics suggest exactly as much. This duration alone suggests a potential due process violation. Ultimately, though, whether this prolonged detention is *excessive* and therefore punitive is a relative question. The duration of detention itself must be weighed against two other considerations: First are the regulatory purposes for detention—preventing flight risk and protecting public safety. Whether the duration of detention is excessive depends in part on the degree of those risks and the extent to which Mr. Doe's detention mitigates them. Second are the conditions of detention. Because not all forms of detention are equivalent, whether the duration is excessive relative to its purposes also depends in part on how harsh the conditions are.

### 2. Reasons for Delay

The second factor is closely related to the first factor and addresses the reasons for any delays that have contributed to the duration of detention. Here, Mr. Doe has faced several delays that have prolonged his various legal proceedings. Some have been at his or his counsel's request (although Mr. Doe asserts that at least some of the continuances were requested without his knowledge or consent by his previous attorney, who he claims was not effective and was in fact suspended from practicing law for some of the time at issue). Other delays have been at the government's urging, including most recently its request to remand one of Mr. Doe's Ninth Circuit petitions to the BIA. Still others appear to be a result of the fact that the immigration system is overextended and that decisions from an immigration judge or the BIA take time—three

months to make the initial removal determination, for example, and six months to decide the direct appeal. Ultimately, given the several delays and the varying reasons behind them, this factor does not weigh strongly either way.

### 3.     Evidence of Flight Risk and Danger

Whether the length of Mr. Doe's detention has become impermissibly punitive depends in part on whether it has become excessive in relation to its regulatory purpose. *See United States v. Salerno*, 481 U.S. 739, 748 (1987) (suggesting that at some point, "detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal"). Here, the government's regulatory purposes are limiting flight risk and preventing danger to the community. So determining whether Mr. Doe's prolonged detention has become punitive requires considering the extent to which it serves those purposes. This, in turn, requires evaluating the evidence used to determine whether Mr. Doe constitutes a flight risk or a danger.

The evidentiary basis for Mr. Doe's detention has shifted over time.

Mr. Doe was initially detained under Section 1226(c) without any individual review of whether he posed a risk warranting detention. This is because Section 1226(c) creates an irrebuttable presumption that noncitizens who have been convicted of certain crimes are a sufficient flight risk or danger that detention is justified regardless of individual circumstances. Thus, Mr. Doe was initially detained based solely on the fact of his 1997 and 2001 convictions.

Two years into Mr. Doe's detention, in response to his habeas petition, this Court ruled that automatic detention without individual consideration eventually violates procedural due process. The Court therefore ordered a bond hearing to consider whether Mr. Doe's "detention remains warranted to protect the public or prevent Mr. Doe from fleeing." And as required by Ninth Circuit precedent, the Court directed that the government would bear the burden of proof by clear and convincing evidence that Mr. Doe's detention was warranted. 2023 WL 8307557, at *10–11 (applying the evidentiary standard set forth in *Singh v. Holder*, 638 F.3d 1196, 1205 (9th Cir. 2011)). As the Court noted, Mr. Doe's "decades-old criminal convictions may be relevant in determining whether Mr. Doe constitutes a *current* threat to public safety" but "they are certainly not dispositive, especially without individualized consideration." *Id.* at *9. The Court explained

that "[t]o presume dangerousness to the community and risk of flight based solely on [a] past record does not satisfy due process." *Id.* (quoting *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398–99 (3d Cir. 1999)).

In December 2023, the immigration judge conducted a videoconference bond hearing for Mr. Doe. The government submitted the following documents in order to meet its burden of proving by clear and convincing evidence that Mr. Doe's detention remained warranted:

- A copy of the I-213 "Record of Deportable/Inadmissible Alien" form prepared for Mr. Doe, which briefly summarizes his criminal history.[3]
- Mr. Doe's FBI criminal history record, which includes details of the events leading to Mr. Doe's 1997 and 2001 convictions, as well as an earlier citation for vandalism.
- The California state court records from Mr. Doe's 1997 and 2001 convictions, as well as state forms identifying Mr. Doe's next of kin and his photograph.

Dkt. No. 49-5. Mr. Doe submitted declarations from himself and family and friends, documents showing that he had completed rehabilitative and self-improvement classes, a psychological evaluation, documents related to his relief from removal, and criminal and parole documents.

Based on this record, the immigration judge ruled orally at the hearing that bond should be denied because the government had met its burden of showing by clear and convincing evidence that Mr. Doe "is a danger to the community and such a substantial flight risk that bond should be denied." Dkt. No. 35-1, at 16. The immigration judge explained his findings as follows:

> The court bases its danger finding on respondent's criminal history, which includes two violent convictions, one in 1997 for the assault with a deadly weapon … with a four-year sentence, and then the conviction in April 2001 for the second-degree robbery with the street gang enhancement and the recidivism enhancement, as well as the attempted second-degree robbery conviction, in which respondent was sentenced to 26 years and four months in prison. The court is

---

[3] Mr. Doe objected to the admission of the I-213 form on the basis that it contained several factual errors, including that Mr. Doe does not have a child, that he claimed to be a current Sureño gang member, that his felony conviction was "recent," and that Mr. Doe did not claim a fear of harm in his home country. The immigration judge admitted the I-213, finding it "relevant and probative," but stated that the findings in the ultimate decision did not rest on the alleged errors in the I-213 but rather on other uncontested evidence in the record. Dkt. No. 42, at 4 n.2.

especially concerned with the gang enhancement from this conviction, and the court finds that the respondent has submitted insufficient evidence of his rehabilitative efforts to overcome the seriousness of his criminal history.

With regards to the flight risk, respondent's I-589 [application for withholding of removal] was denied. He was ordered removed. His appeal was dismissed by the BIA, and he does have a [petition for review] pending with the Ninth Circuit, but as of right now, his prospects of future relief are not great. Additionally, the court will note that … [the government] did agree to remand, but that was only for the motion to reopen with the ineffective assistance of counsel claims, and not … for the actual case itself. And additionally, even with that, respondent was only eligible for deferral of removal under the Convention Against Torture because of his convictions. He does have the pending I-130 [petition for alien relative], but due to that conviction, the prospects of ultimately being granted adjustment of status are not great either, so for this reason, the court finds that the respondent is such a substantial flight risk that bond should be denied.

*Id.* at 16–17.

As the memorandum following the immigration judge's decision makes clear, the immigration judge applied the test from *In re Guerra*, 24 I & N Dec. 37, 39 (BIA 2006), to determine whether to release Mr. Doe on bond. This is the legal test for a bond (or "custody redetermination") hearing under Section 1226(a), which gives the Attorney General "broad discretion" to release most detained noncitizens on bond or with other conditions pending removal proceedings. *Guerra*, 24 I & N Dec. at 40. In such proceedings, the burden is normally on the noncitizen to show that release on bond is warranted, *id.*, but here, as required under Ninth Circuit precedent, the burden was on the government.[4] The *Guerra* factors, as summarized by the immigration judge, included Mr. Doe's "(1) fixed address in the United States or lack thereof; (2) length of residence in the United States; (3) family ties in the United States and whether those ties may entitle him to permanent resident status in the future; (4) employment history; (5) record of

---

[4] The memorandum concluded that Mr. Doe "submitted insufficient evidence of … rehabilitative efforts to overcome the seriousness of his criminal history." It cited a BIA opinion holding that a criminal history can create a "presumption" of dangerousness. Because Mr. Doe is not challenging the immigration judge's determination here, the Court need not consider whether this analysis properly placed the burden on the government (as required in bond hearings necessitated by due process) or instead wrongly applied the normal *Guerra* standard and placed the burden on Mr. Doe.

court appearances; (6) criminal history, including the extensiveness, recency, and seriousness of criminal activity; (7) history of immigration violations; (8) attempts to flee prosecution or otherwise evade authorities; and (9) manner of entry into the United States." Dkt. No. 42, at 4.

The immigration judge's oral opinion and written memorandum make clear that the factual basis for finding that Mr. Doe posed a danger to the community was Mr. Doe's criminal history. Similarly, the factual basis for finding that Mr. Doe posed a flight risk was the procedural posture and the predicted outcomes of Mr. Doe's removal challenges and related proceedings.

The first issue the Court must address is whether it has jurisdiction to consider the evidence relating to Mr. Doe's flight risk or danger, which necessarily overlaps with the evidence considered by the immigration judge at the bond hearing. Section 1226(e) specifies that "discretionary judgment[s] regarding the application of this section shall not be subject to review." The Ninth Circuit recently determined (in a subsequently vacated opinion) that subsection (e) applies not only to bond hearings required by statute under Section 1226(a) but also to bond hearings required as a matter of due process for detainees held under Section 1226(c). *See Martinez v. Clark*, 36 F.4th 1219, 1228 (9th Cir. 2022), *vacated* ⸺ S. Ct. ⸺, 2024 WL 1607718 (Apr. 15, 2024).[5]

Section 1226(e) does not prohibit the Court from considering evidence of Mr. Doe's flight risk or danger because Mr. Doe is not seeking to directly reverse the immigration judge's bond decision. As noted above, that decision applied the *Guerra* test for bond hearings required under Section 1226(a). Mr. Doe's substantive due process challenge involves a different test derived from constitutional rather than statutory standards. The question is not whether detention is warranted in the abstract or whether release is appropriate as a matter of discretion, but whether the duration of Mr. Doe's detention has become excessively prolonged given the government's interests and the conditions of confinement. This inquiry requires evaluating the degree to which

---

[5] *Martinez* was vacated so that the Ninth Circuit could consider the Supreme Court's intervening decision in *Wilkinson v. Garland*, 601 U.S. 209 (2024). The Court cites *Martinez* solely to note that that the holding therein would not apply to the current petition even if the Ninth Circuit were to reach the same conclusion on remand.

Mr. Doe poses a flight risk or danger, which in turn requires the Court to consider the evidence related to those risks.

As noted already, the Ninth Circuit has held that even strong evidence of flight risk or danger cannot justify unlimited civil detention. In *United States v. Torres*, the habeas petitioner had been indicted on federal charges of possession with intent to distribute methamphetamine and of being a felon in possession of ammunition. 995 F.3d at 699. The petitioner had previously been convicted of five drug and weapons-related felonies. After 21 months in pretrial detention, the petitioner brought a due process habeas petition. In balancing the relevant factors, the Ninth Circuit concluded that the "strength of the evidence supporting … detention" supported the conclusion that it was "rationally connected to a regulatory purpose—preventing danger to the community and ensuring Torres will appear as required." *Id.* at 709. But the Ninth Circuit emphasized the limits of its logic, noting that "at some point, regardless of the risks associated with Torres's release, due process will require that he be released if not tried." *Id.* at 710. The Ninth Circuit thus made clear that even with strong evidence of potential danger to the community, 21 months of civil detention was already "approaching the limits of what due process can tolerate." *Id.* at 709. In other words, even the strongest evidence of flight risk or danger cannot justify truly indefinite detention. Instead, due process always requires some degree of balance and proportionality.

Under *Torres*, the Court must consider Mr. Doe's individual circumstances to determine whether he presents a risk of flight or danger sufficient to justify his continued detention.

The government's evidence that Mr. Doe may pose a danger to the community was limited to his past criminal convictions. The crimes are serious: assault with great bodily injury and robbery. The question here, though, is how strongly these past convictions evince *current* danger. The conduct underlying Mr. Doe's convictions occurred more than 20 years ago. As discussed above, decades-old criminal conduct is relevant but not dispositive in evaluating present danger, and there are serious due process concerns with simply presuming someone remains dangerous based on past conduct without individualized consideration and any recent evidence. The government has provided no further evidence beyond the fact and circumstances of Mr. Doe's past

17

convictions to suggest that he remains a danger. For example, the government has provided no indication that Mr. Doe behaved in a way that suggests he remains dangerous during his two decades in prison. Mr. Doe emphasizes that at the end of his prison sentence he was in "minimum custody status" and allowed to volunteer for the Fire Camp based on his sustained good behavior in prison, ability to follow rules, and participation in rehabilitative programming.[6] Moreover, in finding that Mr. Doe posed a flight risk based on the procedural posture of his case, the immigration judge implicitly found that Mr. Doe is strongly incentivized to remain in the United States—circumstances that would equally give Mr. Doe a reason to avoid criminal conduct that would again subject him to detention and removal if released.

The government's evidence that Mr. Doe poses a flight risk centers on the procedural posture and predicted outcomes of his pending proceedings. The immigration judge determined that Mr. Doe would pose a flight risk if released because his conviction makes him ineligible for many forms of relief, because his Convention Against Torture claim requires a high standard of proof, and because his appeal of his removal order was dismissed. Because Mr. Doe has a final order of removal and limited potential for relief, the immigration judge concluded that he is a flight risk. Even assuming the immigration judge is correct in his predictions about the likelihood that Mr. Doe will obtain the relief he is seeking, however, the real question is whether Mr. Doe poses a flight risk that cannot be mitigated. And none of the evidence suggests that any flight risk could not be reduced through monitoring or other similar alternatives, as discussed below.

In sum, the fact of Mr. Doe's past criminal convictions and the status of his removal proceedings suggests at least some risk of danger and flight, although the government has not

---

[6] In finding that Mr. Doe had not shown that his rehabilitation efforts "sufficiently diminish[ed] the risk of danger to the community," the immigration judge cited BIA precedent "affording diminished weight to rehabilitation efforts in prison." Dkt. No. 42, at 7 (citing *In re C-A-S-D-*, 27 I & N Dec. 692 (BIA 2019)). This presumptive reasoning is unconvincing and constitutionally suspect. Mr. Doe spent the entire two decades between his criminal convictions and his civil detention by ICE in state prison. Thus the *only* evidence of rehabilitation he could possibly have put forward is evidence of his rehabilitation efforts while in prison. Discounting rehabilitation efforts simply because they were undertaken by a prisoner rather than considering the specific evidence case-by-case creates the kind of "[p]rocedure by presumption" that "cannot stand" under the Due Process Clause. *See Stanley v. Illinois*, 405 U.S. 645, 656–57 (1972).

United States District Court
Northern District of California

provided any other evidence from the past 23 years suggesting that Mr. Doe remains dangerous today as he approaches the age of 50. These risks must also be considered in conjunction with the next related factor—whether any risks can be mitigated through alternatives to detention.

### 4. Alternatives to Detention

The next question is whether the government's interests in limiting the risks of flight and community danger can be adequately protected through alternatives to detention that are less harsh. If alternatives can mitigate risks and protect the government's interests, then detention (instead of one of these alternatives) is excessive in relation to those interests and unconstitutionally punitive.

ICE's Intensive Supervision Appearance Program offers several alternatives to detention at a facility like GSA, including GPS tracking (e.g., ankle monitors), a smartphone app, or reporting by telephone. Dkt. No. 50, at 42; *see also* ICE, Alternatives to Detention, perma.cc/384H-HCLY.

The evidence before the Court suggests that alternatives like these could reduce Mr. Doe's flight risk. In a report on the Intensive Supervision Appearance Program, the Department of Homeland Security recently stated that the "vast majority" of program participants over five years "were compliant with the requirements of the program. The success rate for single adults … ranged from 72.7 percent to 88.9 percent." Dkt. No. 50, at 44. ICE data for 2023 shows that participants in these programs appeared at 99.1% of hearings, including 93.6% of final hearings. Dkt. No. 50, at 28. And these statistics are not disaggregated by the type of monitoring. Even assuming Mr. Doe poses a flight risk as the immigration judge found (which Mr. Doe disputes), ICE's statistics suggest that the risk can be significantly mitigated through GPS tracking or other alternatives.

The government emphasizes that there is no basis to conclude that alternatives could mitigate any danger posed by Mr. Doe to the community, arguing that ICE's alternatives are "flight-mitigation programs" not designed to mitigate dangerousness. Mr. Doe counters that the government has not presented arguments or evidence suggesting that alternatives cannot address risk of danger. Mr. Doe points to studies from the criminal context suggesting that electronic monitoring can reduce recidivism. One reason it is difficult to speculate about how GPS tracking

or other alternatives might mitigate any danger that Mr. Doe poses to the community is that the immigration judge's dangerous determination, based only on Mr. Doe's past convictions, is inherently vague. In the abstract, though, someone who knows their location is being monitored will face at least some additional incentive not to engage in criminal conduct. The evidence provides at least some indication that monitoring programs can mitigate risks of recidivism.

In sum, the evidence regarding alternatives suggest that GPS monitoring or other programs can significantly mitigate flight risk and potentially mitigate any danger to the community.

### 5. Conditions of Detention

"[A] civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive." *Jones*, 393 F.3d at 933. As discussed above, due process sets an absolute floor on the conditions civil detainees can be confined in. At a minimum, conditions must be less restrictive than post-conviction criminal detention.

The conditions of confinement also inform whether the duration of detention has become punitive. Thirty months in an overcrowded dormitory with limited access to medical care, legal assistance, and communications to the outside world is different, for constitutional purposes, from the same amount of time spent in more comfortable accommodations with greater access to services. Section 1226(c) requires detention, but it does not mandate a particular form. How to detain noncitizens subject to Section 1226 is a policy (and budgetary) choice left to Congress and the executive branch. Here, the government's choice to detain noncitizens like Mr. Doe in a crowded facility, with operations outsourced to a private contractor, informs the due process consideration of how long is too long. Whether or not conditions are inherently punitive when compared to other forms of detention like post-conviction imprisonment, harsh conditions multiply the burden on liberty for any given period.

Under this standard, Mr. Doe's detention is punitive if the conditions at GSA are harsher than those he faced in state prison, which were by definition intended to punish. This requires "comparing the relevant conditions of confinement as a whole." *Fraihat v. ICE*, 16 F.4th 613, 649 (9th Cir. 2021).

1   Mr. Doe has identified several ways his detention at GSA is harsher than state prison. He

2 has submitted declarations from attorneys who work at GSA alleging rampant health and safety

3 issues at the facility, including Covid-19 outbreaks (without adequate testing), long delays in

4 accessing medical care, and even a citation by the California Division of Occupational Safety and

5 Health. Dkt. No. 50, at 12. According to this evidence, the population at GSA has more than

6 doubled since January 2023. *Id.* As a result, access to legal services and medical care has been

7 limited. Mr. Doe notes that he has missed messages from his attorney as a result of limited access

8 to tablets. Dkt. No. 49-3, at 4. And as the immigration judge's memorandum highlights, limited

9 access to healthcare has also prevented Mr. Doe from maximizing his own rehabilitation and is

10 impeding the government's interests in minimizing his potential dangerousness. According to the

11 immigration judge, Mr. Doe "was recently diagnosed with multiple mental health conditions," but

12 "he did not submit evidence of an established treatment plan to address such conditions, much less

13 his compliance with any such plan." Dkt. No. 42, at 9. The immigration judge noted that lack of

14 "proper treatment for … mental health symptoms" increased Mr. Doe's risk of recidivism.

15   Mr. Doe also asserts that he has less privacy in GSA's dormitory accommodations than he

16 had in state custody, where he shared a cell with one cellmate. Dkt. No. 49-3, at 4. He states that

17 GSA offers less access to outdoor space and fresh air and does not offer fitness and recreational

18 programming like sports tournaments. *Id.* He also asserts that it is more difficult for his family,

19 including his aging mother, to visit him at GSA because the facility is located much farther away.

20 *Id.* at 5. According to the attorneys who have worked at GSA, the facility has not fully complied

21 with ICE's own Performance-Based National Detention Standards. Dkt. No. 50, at 12.

22   The Court provided the government an opportunity to submit its own additional evidence

23 regarding the conditions at GSA, but the government declined to do so.

24   Determining whether the conditions at GSA are worse "as a whole" than at the state

25 facilities where Mr. Doe was imprisoned is a difficult comparison that would require

26 comprehensive evidence. But the evidence now before the Court at least suggests several

27 important ways in which the conditions at GSA are not only inherently harsh but also worse than

28

the conditions Mr. Doe faced in state prison. At minimum, the Court must weigh these conditions appropriately in considering the burden imposed by the duration of Mr. Doe's detention.

\*     \*     \*

Weighed together, these five factors demonstrate that Mr. Doe's detention has become excessive in relation to the government's interests, serious as they are. The 30 months Mr. Doe has been detained far surpass the 21 months of civil detention that the Ninth Circuit held in *Torres* was "approaching the limits of what due process can tolerate" even in the face of much stronger evidence justifying continued detention. *See Torres*, 995 F.3d at 709–10. Both sides are responsible for at least some of the delays, but many have been beyond either party's control. Although Mr. Doe was convicted more than two decades ago of serious crimes, he has demonstrated rehabilitation efforts since then, including through his work as a firefighter and his record of good behavior while in state custody. The government has submitted no evidence from after 2001 suggesting that Mr. Doe remains dangerous. And while the immigration judge concluded that Mr. Doe poses a flight risk because of the posture and predicted outcome of his case, the evidence suggests that alternatives to detention can significantly mitigate this risk and potentially reduce the danger Mr. Doe might pose. There are at least several alternatives to detention that have been demonstrated to be effective. Finally, the conditions Mr. Doe faces at GSA are harsh—possibly harsh enough to be punitive in their own right, but certainly harsh enough to mean that Mr. Doe's continued detention under those conditions, after 30 months and with no end currently in sight, has become punitive in light of the available alternatives.

Accordingly, Mr. Doe's continued detention without have been afforded the procedural protections required by the Constitution before such punishment can be imposed violates his rights under the Due Process Clause of the Fifth Amendment.

## IV.    Conclusion

For the foregoing reasons, Mr. Doe's continuing detention violates due process. The Constitution requires that this violation be remedied. The Court "possesses broad equitable authority to remedy … constitutional violation[s]" in the context of immigration detention. *Roman v. Wolf*, 977 F.3d 935, 945 (9th Cir. 2020). Still, the Court recognizes that equitable relief should,

to the extent possible, "avoid imposing provisions that micromanage the … administration" of facilities like GSA. *See id*.

The Court will therefore ask the government to propose an appropriate remedy to address the Court's determination that Mr. Doe's ongoing civil detention violates his due process rights. The government shall submit two proposed orders by May 9, 2024:

1. In the first order, the government shall propose an injunction that would modify the conditions of Mr. Doe's detention to rectify the due process violations and ensure that the conditions are not harsher than Mr. Doe's state incarceration. This order could address the alleged overcrowded housing conditions Mr. Doe faces, guarantee appropriate medical and mental health treatment and timely access to legal services for Mr. Doe, and address the other concerns identified in this order and the parties' submissions. It could also reiterate the requirement that GSA comply with ICE's own internal rules and regulations with respect to Mr. Doe. This order could alternatively propose transferring Mr. Doe to a different facility where conditions are less restrictive, including potentially a location that addresses Mr. Doe's concerns about being separated from his family.

2. In the second order, the government shall propose an injunction that would require Mr. Doe's immediate release from detention under whatever conditions the government believes will help address its concerns regarding flight risk or danger to the community. The conditions may include, but are not limited to, enrollment in whichever of the ICE Intensive Supervision Appearance Programs the government believes is most appropriate for Mr. Doe's circumstances.

After the government files these proposed orders, Mr. Doe may submit a response of up to five pages identifying any changes to the government's proposals he believes are necessary to protect his due process rights. Mr. Doe should submit this response as soon as practicable but no later than seven days after the government's submission.

Given the circumstances of Mr. Doe's petition and his allegations that he will face torture or death if he returns to Mexico, the Court previously granted Mr. Doe's motions to proceed under

pseudonym and to file the addendum to his habeas petition under seal. The parties have also filed a joint administrative motion to file under seal several of the evidentiary submissions that the Court requested in advance of this order. Because this order relies in part on those submissions, this order will be provisionally filed under seal. Either party may submit, by May 22, 2024, a motion to seal portions of this order or any other documents which are currently restricted on the public docket but which the Court has not previously ordered sealed. The Court will then resolve the pending motion to seal and any forthcoming motions to seal this order or other documents.

**IT IS SO ORDERED.**

Dated: May 2, 2024

_____
P. Casey Pitts
United States District Judge